**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ELLIOT McGUCKEN, an individual, *Plaintiff-Appellant*, | No. 21-55854 |
| v. | D.C. No. 2:20-cv-01923-RGK-AS |
| PUB OCEAN LIMITED, DBA AbsoluteHistory.com, DBA MagellanTimes.com, DBA MaternityWeek.com, DBA NewRavel.com, DBA Scribol Publishing, DBA Scribol.com, *Defendant-Appellee*, | OPINION |
| and | |
| DOES, 1–10, inclusive, *Defendant.* | |

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted May 13, 2022
Pasadena, California

Filed August 3, 2022

2    McGucken v. Pub Ocean Ltd.

Before: Sandra S. Ikuta, Jacqueline H. Nguyen, and
John B. Owens, Circuit Judges.

Opinion by Judge Nguyen

## SUMMARY[*]

### Copyright

The panel reversed the district court's summary
judgment in favor of the defendant, based on a fair use
defense in an action under the Copyright Act, and remanded
for further proceedings.

Elliott McGucken alleged copyright infringement in the
posting by Pub Ocean Ltd. of an article about an ephemeral
lake that formed on the desert floor in Death Valley, using
twelve of McGucken's photos of the lake without seeking or
receiving a license.

The panel held that Pub Ocean could not invoke a fair
use defense to McGucken's copyright infringement claim.
Under 17 U.S.C. § 107, in determining whether fair use
applies, a court must analyze the purpose and character of
the use, the nature of the copyrighted work, the amount and
substantiality of the portion used in relation to the
copyrighted work as a whole, and the effect of the use upon
the potential market for or value of the copyrighted work.
The court must analyze and weigh these non-exhaustive

---

[*] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

factors in light of the purposes of copyright. The panel held that the four statutory factors help illuminate what kind of creativity merits protection from the ordinary strictures of copyright law. In defining and identifying that creativity, a court considers whether the copying use is transformative, meaning that it adds something new and important.

The panel determined that the first statutory factor weighed against fair use. The panel concluded that Pub Ocean's work made a commercial use of McGucken's photos, and this use was not transformative because the article used the photos for exactly the purpose for which they were taken: to depict the lake. Further, Pub Ocean did not meaningfully transform the photos by embedding them within the text of the article, but rather used them as a clear, visual recording of the article's subject matter.

The panel determined that the second statutory factor, the nature of the copyrighted work, weighed against fair use because the photos were the creative product of many technical and artistic decisions.

The third factor, the amount and substantiality of the portion used, weighed against fair use because Pub Ocean used McGucken's photos with only negligible cropping, and it copied extensively without justification.

The fourth factor, market effect, weighed against fair use because, if carried out in a widespread and unrestricted fashion, Pub Ocean's conduct would destroy McGucken's licensing market.

Because all four statutory factors pointed unambiguously in the same direction, the panel held that the

4          McGucken v. Pub Ocean Ltd.

district court erred in failing to grant partial summary
judgment in favor of McGuckin on the fair use issue.

## COUNSEL

Scott Alan Burroughs (argued), Trevor W. Barrett, and
Frank R. Trechsel, Doniger / Burroughs, Venice, California,
for Plaintiff-Appellant.

Shane W. Tseng (argued) and Albert T. Liou, Prospera Law
LLP, Los Angeles, California, for Defendant-Appellee.

**OPINION**

NGUYEN, Circuit Judge:

As the saying goes, a picture is worth a thousand words. One powerful image can drive interest in a story that would otherwise go unnoticed. Copyright protection allows an artist to reap the rewards of her creative endeavors, but it cannot stifle all downstream expression that a work might inspire. As Justice Story explained, because "there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout," the fair use doctrine allows other creators to "borrow, and use much which was well known and used before." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994) (quoting *Emerson v. Davies*, 8 F. Cas. 615, 619 (C.C.D. Mass. 1845)). The fair use doctrine does not, however, allow infringers "to avoid the drudgery in working up something fresh" by exploiting the value of an image they did not create. *Id.* at 580.

Photographer Elliot McGucken captured a series of photographs of an otherworldly sight—an ephemeral lake that had formed on the desert floor in Death Valley after heavy rains in March 2019. McGucken licensed his photos to several websites which ran articles about the lake. Pub Ocean Ltd., a digital publisher, also posted an article about the lake using twelve of McGucken's photos, but it neither sought nor received a license.

We hold that Pub Ocean cannot invoke a fair use defense to McGucken's copyright infringement claim. Pub Ocean's use was in no way transformative—the article used McGucken's photos to depict the ephemeral lake, which was exactly the purpose for which they were taken and exactly the function for which the photos had been licensed to other websites. Because all of the fair use factors favor

McGucken, we reverse the district court's summary judgment in favor of Pub Ocean and remand for further proceedings.

## I. Factual Background and Procedural History

### A.  McGucken's Photos

In early March 2019, Death Valley received about one-third of its annual precipitation over the course of a single day.  The storm left a shallow lake on the desert floor stretching ten miles.  When the skies cleared and the winds calmed, the lake was perfectly still, and its surface reflected back the surrounding mountains and sky.  Without a photographer to, in McGucken's words, "render rare, fleeting beauty eternal," this scene may well have been lost to time.

At his own expense, McGucken had traveled to the area with his camera, ready to capture a scene just like this.  He first saw what appeared as a "small and close" pool of water from the road, but he knew that distances in Death Valley can be deceptive.  After a few hours of hiking, the true scale of the lake came into view, and it was "breathtaking."  Shortly after he reached the water's edge, the wind briefly died down and "the water turned to glass."

During those "lucky, magically strange, and even eerie minutes," McGucken got to work.  He employed "a classical technique in art," "composing . . . using the golden ratio," a subject about which he had "penned a couple books."  He took and then edited a series of photographs from different vantage points.  With a little luck, a little sweat, and plenty of skill, McGucken produced a series of photos of stunning beauty.

McGucken v. Pub Ocean Ltd.          7









McGucken posted the photos to Instagram, where they were shared widely.  In the following weeks, McGucken was contacted by several websites hoping to publish his photos in articles about the lake.  With his permission, McGucken's photos appeared in SF Gate, the Daily Mail, the National Parks Conservation Association, PetaPixel, Smithsonian Magazine, AccuWeather, Atlas Obscura, and Live Science.

## B.  Pub Ocean's Infringing Article

Pub Ocean is a U.K.-based digital publisher.  It operates a network of websites catering to interests in travel, history, parenting, pop culture, and current events.  On April 15, 2019, Pub Ocean published an article on its websites that used twelve of McGucken's photos.  Pub Ocean neither

sought nor received McGucken's permission.   Through advertising, the article earned Pub Ocean $6,815.66 in the span of a year.

Pub Ocean's article was titled, "A Massive Lake Has Just Materialized In The Middle Of One Of The Driest Places On Earth."   As this title indicates, the focus of the article was the ephemeral lake.   The article begins and ends with a discussion of the lake.   And much of the article describes how the ephemeral lake formed and how McGucken came to photograph the phenomenon.   McGucken's photos are used in those portions of the article that specifically discuss the lake.

The article also contains a handful of digressions on loosely related topics.   For example, apropos of the lake's setting, the article riffs on the topic of deserts, informing readers that "deserts make up around a third of the landmass on planet earth" and that "the driest place on Earth is the Atacama Desert in South America."   The article also spends a few paragraphs on facts about Death Valley.

Some of the digressions take readers further afield.   The article discusses other ephemeral lakes around the world, such as those that appear in Australia and Argentina.   And it analogizes ephemeral lakes to other ephemeral phenomena in nature, such as desert superblooms, and a "vanishing island" in the South Pacific.

Like the article's discussion of the ephemeral lake, these other topics are also illustrated.   The article includes twenty-eight photos from sources other than McGucken that loosely track the text.   For example, when the article discusses deserts, photos of unspecified deserts appear.   Fields of wildflowers appear above a discussion of superblooms.   And

10                    MCGUCKEN V. PUB OCEAN LTD.

photos of small islands appear when vanishing islands are discussed.

The photos appear prominently in the article's visual layout.  In size, the photos dwarf the text.  In a web browser, the article appears not primarily as a piece of writing.  Rather, it appears as a series of photos with the text broken up into tiny captions underneath.  A few examples appear below.



For McGucken, the discovery of the lake was a strange experience. Apparently, when he first caught sight of the phenomenon, the weather was blustery – typical conditions for Death Valley. But after the breeze subsided, the photographer was confronted with an eerily serene scene.



When rain fills Lake Mackay with a shallow layer of water, in fact, it becomes the biggest lake in the whole of Western Australia. Indeed, the feature is so significant that it plays an important role in the region's Aboriginal myths and legends. For much of the year, however, it's little more than a dry bed.



In these unusual conditions, McGucken was able to capture some stunning photographs of the lake. And in them, the still waters perfectly reflect the snow-capped summit of Telescope Peak, the loftiest pinnacle in Death Valley. So far, the captivating shots have been liked hundreds of times on Instagram.



In South America, meanwhile, Argentina's Patagonian Desert is dotted with ephemeral lakes and rivers. Apparently, these form when snow from the peaks of the Andes melts and runs down into the valleys below. And even as Africa's Sahara – the biggest desert on Earth – temporary streams known as wadis can be found scattered across the landscape.

## C.  This Lawsuit

McGucken filed this copyright infringement suit against Pub Ocean in the Central District of California.  McGucken filed a motion for summary adjudication focused on Pub Ocean's fair use defense.  The district court *sua sponte*

granted summary judgment for Pub Ocean, concluding that it was entitled to a fair use defense as a matter of law.[1]

## II. Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291.  We review *de novo* a district court's summary judgment on a fair use defense.  *See Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1175 (9th Cir. 2013).

## III. Analysis

### A.  Fair Use Principles

"[T]he 'fair use' doctrine . . . [is] an 'equitable rule of reason' that 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'"  *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1196 (2021) (citation omitted).  The fair use doctrine is a "guarantee of breathing space within the confines of copyright," *Campbell*, 510 U.S. at 579, and a "backstop" that "counterbalance[s] the exclusive rights of a copyright," *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 450 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2803 (2021).  "[T]he fair use of a copyrighted work . . . is not an infringement of copyright." 17 U.S.C. § 107.

---

[1] McGucken also filed suit against Newsweek in the Southern District of New York concerning its use of embedded links to McGucken's Instagram posts. *See McGucken v. Newsweek LLC*, 464 F. Supp. 3d 594 (S.D.N.Y. 2020).  The district court denied Newsweek's motion to dismiss on the basis of fair use. *Id.* at 604–09.  That case has settled. *See* No. 1:19-cv-09617 (S.D.N.Y.), Dkt. 85 (Apr. 13, 2022).

As codified in the Copyright Act of 1976, courts must analyze the following non-exhaustive factors in determining whether fair use applies:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

These factors are analyzed and weighed "in light of the purposes of copyright." *Dr. Seuss*, 983 F.3d at 451 (quoting *Campbell*, 510 U.S. at 578). That analysis is "flexible" and "may well vary depending upon context." *Google*, 141 S. Ct. at 1197. The four statutory factors simply help illuminate what kind of creativity merits protection from the ordinary strictures of copyright law.

For decades, courts have used the concept of "transformation" to define and identify that creativity in fair use cases. *See Campbell*, 510 U.S. at 578–79. Although judicially created, this concept "permeates" fair use analysis. *Dr. Seuss*, 983 F.3d at 452. "[D]etermining whether and to what extent the new work is transformative" is the "central purpose of the first-factor inquiry," and it "influences the lens through which we consider" the third and fourth factors.

*Id.* at 451–52 (citations and internal quotation marks omitted).

Simply put, "the word 'transformative' . . . describe[s] a copying use that adds something new and important." *Google*, 141 S. Ct. at 1203. The "benchmarks" of transformative use are "(1) further purpose or different character in the defendant's work, i.e., the creation of new information, new aesthetic, new insights and understanding; (2) new expression, meaning, or message in the original work, i.e., the addition of value to the original; and (3) the use of quoted matter as raw material, instead of repackaging it and merely superseding the objects of the original creation." *Dr. Seuss*, 983 F.3d at 453 (citations and internal quotation marks omitted).

Fair use is a mixed question of law and fact. *See Google*, 141 S. Ct. at 1199. Each of the statutory factors encompasses legal and factual questions. For instance, "how much of the copyrighted work was copied" is a factual question, *id.* at 1200, but which way in the fair use analysis that points in a particular case, and by how much, is a legal question.

Although factual questions can arise, the parties in fair use cases often dispute only the legal significance to be drawn from facts. Fair use is thus often resolved at summary judgment, and "we may reweigh on appeal the inferences to be drawn from [the] record." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 800 (9th Cir. 2003) (citation omitted); *see*, *e.g.*, *Dr. Seuss*, 983 F.3d at 461. "Where no material, historical facts are at issue and the parties dispute only the ultimate conclusions to be drawn from those facts, we may draw those conclusions without usurping the function of the jury." *Seltzer*, 725 F.3d at 1175.

**B.  First Factor – Purpose and Character of the Use**

The first fair use factor examines "the purpose and character of the use."  17 U.S.C. § 107(1).  Under this factor, we consider whether the infringing work is transformative and whether it is commercial.  *See Dr. Seuss*, 983 F.3d at 451–52.  For-profit news articles are generally considered commercial uses, *see*, *e.g.*, *Monge v. Maya Mags.*, 688 F.3d 1164, 1176 (9th Cir. 2012), and Pub Ocean does not dispute that its article was commercial.  The focus of the first factor, however, is on transformation because "the more transformative the new work, the less will be the significance of other factors, like commercialism."  *Campbell*, 510 U.S. at 579.

Under our case law, a work that conveys factual information does not transform a copyrighted work by using it as a "clear, visual recording" of the infringing work's subject.  *Monge*, 688 F.3d at 1174 (quoting *L.A. News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997)).  When a copyrighted work is used simply to illustrate what that work already depicts, the infringer adds no "further purpose or different character."  *Campbell*, 510 U.S. at 579.  In that case, copyright law justly treats the infringer as freeriding on the inherent value of the original work.  *See Elvis Presley Enters. v. Passport Video*, 349 F.3d 622, 629 (9th Cir. 2003) (using video clips of musical performances for their "intrinsic entertainment value" was not transformative), *overruled on other grounds as stated in Flexible LifeLine Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995 (9th Cir. 2011) (per curiam).

There is no genuine dispute that Pub Ocean's article used McGucken's photos as a "clear, visual recording" of the lake.  *Monge*, 688 F.3d at 1174 (quoting *KCAL-TV*, 108 F.3d at 1122).  McGucken's photos present a realistic depiction

of the ephemeral lake. And the lake, which the article's title hails as the "Massive Lake" that "Materialized" in Death Valley, was undoubtedly the article's subject. The article begins and ends by discussing the lake, and each of the topics it touches on—from Death Valley to superblooms—bears some relationship to it. The article does not present McGucken's photos in a new or different light. It uses them for exactly the purpose for which they were taken: to depict the lake.

The article likewise does not meaningfully transform the photos by embedding them within the text of the article. We have repeatedly held that "[a]dding informative captions does not necessarily transform copyrighted works." *Sicre de Fontbrune v. Wofsy*, _ F. 4th _, 2022 WL 2711466, at \*9 (9th Cir. 2022).**[2]** And Pub Ocean's article does even less. Photos are inserted every three to four sentences in an article structured as a continuous narrative. There is at most a loose topical connection between each portion of the article and the photos that appear alongside it. Photos of the ephemeral lake appear in roughly the place in the article where it is explicitly discussed. The article does not contain captions that directly describe or engage with the photos. Rather, it essentially uses the photos as visual "filler." *Elvis Presley Enters.*, 349 F.3d at 625. Exploiting the beauty and intrigue of McGucken's photos in this way without adding anything new is not transformative. *See id.* at 629.

---

**[2]** *See also Monge*, 688 F.3d at 1176 (describing "wholesale copying sprinkled with written commentary" as "at best minimally transformative"); *Elvis Presley Enters.*, 349 F.3d at 628 ("[V]oice-overs do not necessarily transform a work."); *KCAL-TV*, 108 F.3d at 1122 ("Although KCAL apparently ran its own voice-over, it does not appear to have added anything new or transformative.").

Our prior cases reinforce this conclusion.  In *Monge*, we held that a gossip magazine did not transform a celebrity's private photos of her secret wedding when it used the photos in an exposé about the wedding.  688 F.3d at 1175–76.  Similarly, in *KCAL-TV*, we held that a network did not transform helicopter footage of the violence at Florence and Normandie during the 1992 Los Angeles riots simply by using that footage as part of the network's coverage of the riots.  108 F.3d at 1122.  Just as in *Monge* and *KCAL-TV*, Pub Ocean's article uses McGucken's photos as a "clear, visual recording" of its subject matter, and it is therefore no more transformative.  *Id.*

To be transformative, the infringing use must bring about a much starker change in expression.  For example, using a thumbnail image of a photo in a search engine "transforms the image into a pointer directing a user to a source of information." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007).  And a musical about a rock band transforms a video clip of the band's performance by using it "to mark an important moment in the band's career" rather than "for its own entertainment value." *SOFA Entm't, Inc. v. Dodger Prods.*, 709 F.3d 1273, 1278 (9th Cir. 2013).  When used in Pub Ocean's article, McGucken's photos undergo no remotely comparable transformation.

Pub Ocean analogizes this case to *Los Angeles News Service v. CBS Broadcasting, Inc.*, 305 F.3d 924 (9th Cir. 2002), but the analogy is strained and unpersuasive.  *CBS* involved the same helicopter footage of the violence at Florence and Normandie at issue in *KCAL-TV*.  305 F.3d at 929.  We held in *CBS* that a television network did transform that footage by using it as part of a show's recurring introductory montage. *Id.* at 939. The introduction featured "a stylized orange clock design superimposed over

a grainy, tinted, monochromatic video background." *Id.*
at 929. As the hands of the clock turned, the background
video changed. *Id.* at 930. One of the video backgrounds
was a few seconds taken from the plaintiff's helicopter
footage. *Id.* at 929–30. As "the program's regular
introduction, it was used to promote the program even when
the program did not cover" the riots or related events. *Id.*
at 939–40. We regarded that use as transformative because,
"beyond mere republication," using the clip in the recurring
introduction "serve[d] some purpose beyond
newsworthiness." *Id.* at 939. By contrast, McGucken's
photos were used "as part of [Pub Ocean's] coverage" of the
lake. *KCAL-TV*, 108 F.3d at 1122.

Contrary to Pub Ocean's argument, *CBS* does not show
that the mere arrangement of McGucken's photos into a
"montage" rendered Pub Ocean's use transformative. While
*CBS* recognized that, as we put it in *Monge*, the
"[a]rrangement of a work in a photo montage . . . , *can* be
transformative," 688 F.3d at 1174 (emphasis added), we
have never held that merely arranging other works into a
compilation is automatically transformative. The critical
fact in *CBS* was not that the plaintiff's footage was placed in
a collection of other video clips but that the footage served a
different function when used as part of an introductory
montage. And we concluded in *Monge* that, despite the
article's arrangement of the plaintiff's wedding photos, there
was "no real transformation of the photos themselves." *Id.*
at 1175. We must evaluate each arrangement for itself to
determine whether it gives new purpose or different
character to the material it takes.

Pub Ocean's primary argument is that its article is
transformative because it places McGucken's photos in the
"wider context" supplied by the article's factual

presentation.   On Pub Ocean's view, the article is transformative because its various tangents "provided context," with information about related topics that was "much more expansive" than the photographs themselves. That argument has little support in fair use doctrine.

Practically speaking, it is hard to imagine what would *not* be a fair use, or what could not be readily turned into a fair use, under Pub Ocean's theory.  Any copyrighted work, when placed in a compilation that expands its context, would be a fair use.  Any song would become a fair use when part of a playlist.  Any book a fair use if published in a collection of an author's complete works.  It would make little sense to treat this kind of "recontextualizing" or "repackaging" of one work into another as transformative. *Dr. Seuss*, 983 F.3d at 453–54.  That is not the kind of creativity that "further[s] . . . the goal of copyright, to promote science and the arts." *Campbell*, 510 U.S. at 579.  Transformation requires more than "the facile use of scissors." *Elvis Presley Enters.*, 349 F.3d at 628 (quoting *Folsom v. Marsh*, 9 F. Cas. 342, 345 (C.C.D. Mass. 1841)).

If Pub Ocean's theory were correct, our cases involving factual works would have turned out differently.  For example, *Elvis Presley Enterprises* involved an "exhaustive," 16-hour documentary covering "virtually all aspects of Elvis' life." 349 F.3d at 625.  The documentary used clips from a series of videos of Elvis performances. *Id.* Each clip became part of the "wider context" of Elvis's career that the entire documentary set forth.  But even though the documentary presented countless details about Elvis beyond what the clips conveyed, we still concluded that many clips were not used in a transformative way. *Id.* at 629. Crucially, that determination was not based on a blanket conclusion about the documentary as a whole, as Pub Ocean

would have it.  Rather, we made a fine-grained analysis of each use and concluded that some of the clips "serve[d] the same intrinsic entertainment value that is protected by Plaintiffs' copyrights," and were thus not transformative. *Id.* That the clips were presented alongside 16 hours of further facts about Elvis played no role in our analysis.

As in *Elvis Presley*, the topics in Pub Ocean's article beyond the ephemeral lake have little bearing on transformation.  The article's tangents about topics like Death Valley and superblooms come before and after McGucken's photos, and they are illustrated by photos of their own from third-party sources.  That these other topics are discussed in other portions of the article does not alter our conclusion that McGucken's photos are used simply to illustrate the ephemeral lake and therefore lack any transformative character.

Pub Ocean also argues that its fair use defense is strengthened by its purpose of reporting the news.  "[N]ews reporting" is an example of fair use listed in the preamble to 17 U.S.C. § 107.[3]  "[T]he analysis of the first fair use factor 'may be guided by the examples given in the preamble to § 107.'"  *Dr. Seuss*, 983 F.3d at 452 (quoting *Campbell*, 510 U.S. at 578–79).  But "[w]hether a use referred to in the first sentence of section 107 is a fair use in a particular case will depend upon the application of the determinative factors."  *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 561 (1985) (citation omitted).  We have recognized that "where the content of the [copyrighted] work *is* the story . . . , news reporters would have a better claim

---

[3] The preamble gives the following examples of fair use: "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."  17 U.S.C. § 107.

of transformation." *Monge*, 688 F.3d at 1175 n.8; *see also KCAL-TV*, 108 F.3d at 1121 ("To the extent that KCAL ran the tape as a news story, this would weigh in its favor."). But the mere category of "news reporting," which is all that Pub Ocean points to[4], is "not sufficient itself to sustain a per se finding of fair use." *Monge*, 688 F.3d at 1173. Therefore, although we do not withhold the label of "news reporting" from Pub Ocean's article, *see Harper & Row*, 471 U.S. at 561 ("[C]ourts should be chary of deciding what is and what is not news." (citation omitted)), that label alone does not get Pub Ocean very far.

For the reasons explained above, Pub Ocean's article did not make transformative use of McGucken's photos. Moreover, the article was commercial, which "further cuts against the fair use defense." *Dr. Seuss*, 983 F.3d at 451–52 (citation and internal quotation marks omitted). Accordingly, the first factor weighs against fair use.[5]

---

[4] Some of Pub Ocean's article was about McGucken's discovery of the lake and his photography. But Pub Ocean did not argue in its brief that these portions of the article treated McGucken's photos themselves as the news story. Given that the article only briefly referenced McGucken's photos themselves and it was otherwise focused on the ephemeral lake, we are skeptical that this theory would help Pub Ocean establish fair use. However, because Pub Ocean failed to raise the issue, we need not reach it. *See Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) (holding that an appellee waived an issue by failing to address it in his answering brief).

[5] We said in *Monge* that "wholesale copying sprinkled with written commentary . . . was at best minimally transformative" and we concluded that the first factor was "at best neutral." 688 F.3d at 1176–77. Here, even if Pub Ocean's minor cropping and arrangement of photos in the text of the article constitutes marginal transformation, *id.* at 1174–75, we would still conclude that the showing of transformation is so weak that the first factor weighs against fair use.

## C. Second Factor – Nature of the Copyrighted Work

The second fair use factor concerns "the nature of the copyrighted work." 17 U.S.C. § 107(2). Because this factor "typically has not been terribly significant in the overall fair use balancing," it merits only brief discussion. *Dr. Seuss*, 983 F.3d at 456 (citation omitted). In assessing the copyrighted work's nature, we consider "the extent to which it is creative and whether it is unpublished." *Monge*, 688 F.3d at 1177.

Although they document a real event, McGucken's photos are creative because they were the product of many technical and artistic decisions. *See VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 744 (9th Cir. 2019) (holding that photos of residences were creative when they were "aesthetically and creatively shot and edited by professional photographers"). While McGucken's photos had been published on Instagram and in online articles, that does not weigh in favor of fair use. *See Dr. Seuss*, 983 F.3d at 456 (explaining that, while a work's unpublished status would weigh against fair use, "the converse is not necessarily true"). Therefore, the second factor weighs against fair use.

## D. Third Factor – Amount and Substantiality of the Portion Used

The third factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This inquiry is concerned with "the quantitative amount and qualitative value of the original work used in relation to the justification for that use." *Dr. Seuss*, 983 F.3d at 456 (quoting *Seltzer*, 725 F.3d at 1178). This factor weighs against fair use if the infringer publishes "the heart" of an "individual copyrighted picture" without justification. *Monge*, 688 F.3d at 1178.

Pub Ocean argues that this factor favors fair use because the article used twenty-eight photos from other sources, making McGucken's photos only a small part of the article as a whole.  While "[t]he inquiry under this factor is . . . flexible," *Id.* at 1179, this approach runs contrary to the text of the statute, which plainly calls for a comparison of "the portion used" to "the *copyrighted work* as a whole" and not the infringing work, 17 U.S.C. § 107(3) (emphasis added). As the Supreme Court has recognized, "a taking may not be excused merely because it is insubstantial with respect to the *infringing* work."  *Harper & Row*, 471 U.S. at 565.

Here, Pub Ocean's taking of McGucken's photos was "total."  *Monge*, 688 F.3d at 1180.  Quantitatively, twelve of McGucken's photos are used with only negligible cropping. Qualitatively, given how much was taken, it is clear that the article took "the 'heart'" of each of the twelve photos.  *Id.* at 1178.  The extent of Pub Ocean's taking could hardly be greater.[6]

Pub Ocean's sweeping use of McGucken's photos lacked any valid justification.  "This factor circles back to the first factor because 'the extent of permissible copying varies with the purpose and character of the use.'"  *Dr. Seuss*, 983 F.3d at 456 (quoting *Campbell*, 510 U.S. at 586–87).  As explained above, the first factor weighs against fair use because Pub Ocean used McGucken's photos for exactly the purpose for which they were taken.  Pub Ocean has failed to

---

[6] While the proper comparison is between the amount used and the *copyrighted* work, "the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material." *Harper & Row*, 471 U.S. at 565; *see also KCAL-TV*, 108 F.3d at 1122 (same).  That twelve of the article's forty photos came from McGucken therefore demonstrates the qualitative value of the photos that were taken.

point to a transformative purpose that would justify reproducing any of McGucken's photos—much less the entirety of twelve of them.

Even assuming Pub Ocean was justified in using some portion of the photos, copying the entirety of twelve of them would be "far more than was necessary." *Monge*, 688 F.3d at 1179. Moreover, Pub Ocean failed to put forward any evidence that other photographs or visual aids were unavailable or an inadequate substitute for McGucken's photos. *See KCAL-TV*, 108 F.3d at 1123 (explaining that infringement was not justified where "there [was] no evidence that alternatives were not available (albeit from a less desirable vantage point)").

Because Pub Ocean copied extensively without justification, the third factor weighs against fair use.

## E. Fourth Factor – Market Effect

The fourth factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor encompasses both (1) "the extent of market harm caused by the particular actions of the alleged infringer," and (2) "'whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market' for the original" and "the market for derivative works."[7] *Dr. Seuss*, 983 F.3d at 458 (quoting *Campbell*, 510 U.S. at 590).

---

[7] McGucken urges us to apply a presumption of market harm, which some of our cases have applied to commercial, non-transformative uses. *See, e.g., Disney Enters. v. VidAngel, Inc.*, 869 F.3d 848, 861 (9th Cir. 2017). *But see Dr. Seuss*, 983 F.3d at 458 ("Mindful of the Court's

It is true that, as Pub Ocean emphasizes, the record reflects little direct evidence of actual market harm caused by Pub Ocean's article.  McGucken was able to license his photos as early as one month after Pub Ocean's article was published.   But Pub Ocean, "as the proponent of the affirmative defense of fair use, 'must bring forward favorable evidence about relevant markets.'"  *Dr. Seuss*, 983 F.3d at 459.  And "to negate fair use," McGucken "need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work."  *Monge*, 688 F.3d at 1182 (quoting *Harper & Row*, 471 U.S. at 568); *see, e.g.*, *Sicre de Fontbrune*, 2022 WL 2711466, at *10 (weighing fourth factor against fair use even though the defendant showed that the price for the original work had increased because there was no evidence "about the effect on the market for licensing the disputed photographs").

The harm to the market for licensing McGucken's photos would be immense.  There is no dispute that a market exists to republish McGucken's photos.  *See VHT*, 918 F.3d at 744 (licensing "a handful of photos" showed "that [a] market was more than 'hypothetical'").  If carried out in a widespread and unrestricted fashion, Pub Ocean's conduct would destroy McGucken's licensing market.  Pub Ocean made the same use of McGucken's photos as the publications that obtained licenses—copying them in an online article about the ephemeral lake.  As we have recognized, an infringing use would destroy a derivative market when the infringing

directive to 'eschew[] presumptions under this factor, we refrain from presuming harm in the potential market' for commercial uses and 'determine it in the first instance.'" (citation omitted)).    Because applying this presumption would make no difference to the outcome, we decline to do so here.

work is of the same type as existing works by licensed users. *See Dr. Seuss*, 983 F.3d at 460 (Because "Seuss has already vetted and authorized multiple derivatives" of the book the defendant had used, "[t]his is not a case where the copyist's work fills a market that the copyright owner will likely avoid.").[8]

Pub Ocean's argument on harm to the potential market turns on its argument that its use was transformative. These issues are linked because "[w]here the allegedly infringing use does not substitute for the original and serves a 'different market function,' such factor weighs in favor of fair use." *Seltzer*, 725 F.3d at 1179 (quoting *Campbell*, 510 U.S. at 591). Since the article was not transformative, we reject this argument. However, it is worth elaborating on this point because the potential market effect "underscores the limited extent to which [Pub Ocean] transformed [McGucken's] works." *Monge*, 688 F.3d at 1182.

Pub Ocean's article is a ready market substitute for McGucken's photos and the articles that would license them. Any consumer interested in McGucken's photos would enjoy Pub Ocean's article. The article contains good-quality reproductions of McGucken's photos, with very little text crowding the view. *Cf. Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821–22 (9th Cir. 2003) (explaining that a low-

---

[8] *See also Elvis Presley*, 349 F.3d at 631 (Because "*The Definitive Elvis* contains the television appearances for which Plaintiffs normally charge a licensing fee . . . , [i]f this type of use became widespread, it would likely undermine the market for selling Plaintiffs' copyrighted material."); *KCAL-TV*, 108 F.3d at 1122–23 (Because "KCAL's stated purpose was to use the tape as 'news' and it was a potential . . . licensee or consumer of LANS's product . . . , given what LANS and KCAL do, KCAL's use of LANS's work for free, without a license, would destroy LANS's original, and primary market.").

resolution thumbnail in a search engine is not a substitute for a clear, full-sized image).  And for some consumers, the article would be even better than a standalone collection of McGucken's photos or a shorter article with no other content.  Pub Ocean's article also includes twenty-eight other photos, many of which similarly depict beautiful natural phenomena that a viewer who appreciates McGucken's photos may also enjoy.  Pub Ocean's "mere duplication of the photos 'serves as a market replacement for [the originals], making it likely that cognizable market harm to the original[s] will occur.'"  *Monge*, 688 F.3d at 1182–83 (quoting *Campbell*, 510 U.S. at 591).  That Pub Ocean's article is an effective market substitute for McGucken's photos and derivative content underscores the non-transformative nature of Pub Ocean's use.

Therefore, because Pub Ocean's use, if widespread, would destroy the market to license McGucken's works, the fourth factor weighs against fair use.

**F.  Balancing**

All four statutory factors point unambiguously in the same direction—that Pub Ocean is not entitled to a fair use defense.  *See Dr. Seuss*, 939 F.3d at 461.  The district court thus erred in granting summary judgment for Pub Ocean based on a fair use defense.  Because "no material, historical facts are at issue and the parties dispute only the ultimate conclusions to be drawn from those facts," *Seltzer*, 725 F.3d at 1175, the district court should have granted partial summary judgment for McGucken on the fair use issue.

## IV. Conclusion

We reverse the district court's grant of summary judgment, direct the district court to enter partial summary

judgment for McGucken on the fair use issue, and remand for further proceedings.

**REVERSED AND REMANDED.**